UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

              Case No. 23-cr-0180-bhl

  v.

DAVID J. DARRAH,

    Defendant.

# ORDER

    Defendant David Darrah is charged in a one-count indictment for possession of a prohibited object in a federal detention facility in violation of 18 U.S.C. §§1791(a)(2), (b)(2) and (c). (ECF No. 1.) The charges are the result of United States Marshals finding drugs secreted in Darrah's buttocks area during a visual inspection of his body cavities while Darrah was in custody waiting to be transferred from a residential re-entry facility to a higher security federal institution. On December 19, 2023, Darrah filed a motion to suppress the evidence recovered during the search, arguing that the search was conducted without reasonable suspicion in violation of the Fourth Amendment. (ECF No. 24.) On February 1, 2024, Magistrate Judge Stephen C. Dries issued a report recommending that Darrah's motion be denied. (ECF No. 39.) Darrah has submitted objections to Judge Dries's report and the matter is fully briefed. For the following reasons, the Court overrules the defendant's objections and adopts the report and recommendation that Darrah's motion to suppress be denied.

## FACTUAL BACKGROUND

    On March 13, 2020, Darrah was sentenced to 60 months imprisonment for possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841 and possession of a firearm by a felon in violation of 18 U.S.C. § 922(g). (ECF No. 48 at 1.) During his prison term, Darrah was transferred from an institutional facility to Parsons House, a residential re-entry center under contract with the Bureau of Prisons. (*Id.*) Darrah "failed out" of Parsons House by committing several rules violations resulting in a transfer to a higher security facility. (ECF No. 24 at 2.)

On September 22, 2023, deputies with the United Sates Marshals Service (USMS) arrived at Parsons House, took Darrah into custody, and transferred him to the USMS detention facility at 517 East Wisconsin Avenue, the federal courthouse. (ECF No. 48 at 2.) When Darrah arrived at the cell block, Deputy United States Marshal (DUSM) Shane Hitchler was present. (*Id.*) Hitchler's incident report reflects that Darrah "appeared to be nervous and very talkative" and that he "had difficulty following simple instructions that were given to him and appeared to be under the influence of something." (ECF No. 24-2 at 1.) Hitchler reported that he was familiar with Parsons House from prior experiences and that he had previously observed prisoners at Parsons House bypass security there. (*Id.*) He further reported that on previous occasions he had recovered contraband from prisoners being brought from Parsons House. (*Id.*) Based on Hitchler's observations of Darrah's behavior and his prior experiences with contraband recovery from prisoners arriving from Parsons House, he determined a strip search of Darrah was warranted. (*Id.*)

The USMS Strip Search policy states as follows:

USMS Policy Directives 9.17 E. 3. **Strip Search**: A complete search of a prisoner's attire and a visual inspection of the prisoner's naked body, including body cavities.

f. When conducting a strip search, the deputy will:

> 1) Instruct the prisoner to remove all loose articles (including valuables, hairpieces, dentures, glasses, etc.). Separate the clothing and any other items from the prisoner prior to the search, and conduct a thorough visual examination of the prisoner's body, from the top of the head to the bottom of the feet.
> 2) Direct the prisoner to vigorously brush his or her hair with fingers to dislodge any contraband. If the prisoner does not, to the satisfaction of the deputy conducting the search, adequately brush his or her hair, the deputy will conduct the hair search by using his or her hands or an item such as a pen or pencil.
> 3) Inspect behind each ear and look inside the prisoner's ear canals, nostrils, and mouth, checking under the tongue, roof of the mouth, and between the lips and gums. Visually inspect down the front of the body, paying close attention to areas such as armpits, breasts, and genital area. Direct the prisoner to face in the opposite direction and conduct a visual inspection of the upper back area.
> 4) Direct the prisoner to spread his or her legs and bend forward at the waist. Observe the anus area and genitals from the rear. Conclude with an observation of the bottoms and between the toes of both feet.
> 5) Conduct a thorough search of all clothing and property removed from the prisoner before returning any of the items to the prisoner. The clothing inspection should include any areas where contraband or weapons may be

located (i.e., pockets, linings, collars, cuffs). Items not returned to a prisoner are to be inventoried on form USM-18, Prisoner Property Receipt.

(ECF No. 24-3 at 3.) A "strip search" is distinct from a "digital cavity search," that involves intrusion into a body cavity, such as the rectum. (*Id.* at 4.)

Deputies required Darrah to remove all his clothing. (ECF No. 24-1 at 2.) During the strip search, Darrah continued to engage in evasive behavior and resisted directives to display the area between his buttocks. (*Id.*) DUSM Alex Christensen who was present for the search reported that Darrah "appeared to be very nervous because his body was shaking violently, and his eyes were darting between all the USMS [personnel] in and around the cell. (*Id.* at 1.) Christensen observed Darrah clenching his butt cheeks "very tightly . . to conceal something in his buttocks." (*Id.*) During the visual body cavity search, Hitchler directed Darrah "to squat down, spread his buttocks and cough." (*Id.* at 2.) Darrah did a "half squat" and was again instructed on what to do. (*Id.*) When Darrah finally complied, the deputies observed a "large brown oval shaped object between Darrah's buttocks and his anus area." (*Id.*) Hitchler asked Darrah what he had between his buttocks. (*Id.*) Darrah at first stated that he did not have anything. (*Id.*) Hitchler advised Darrah to give up the item or he would be transported to the hospital to have it removed. (*Id.*) Darrah again denied possessing anything. (*Id.*) Hitchler contacted his supervisor and ordered Darrah to put on his underwear and sit down while the parties waited for the supervisor to arrive. (*Id.*) Once the supervisor arrived, Darrah spoke to him and after several minutes retrieved the item from his buttocks area. (*Id.*)

The item was a "fist-sized" object wrapped in paper and after testing was found to be a package consisting of seven, separately wrapped smaller packages containing cocaine (11.45 grams total), heroin (2.51 grams total) and 50-plus pills (various substances, including Amphetamine and Alprazolam). (ECF No 24-1 at 1; ECF No. 48 at 3.) Later that day, Dodge County Sheriff's Office (DCSO) personnel picked up Darrah to transport him to the Dodge County Detention Facility (DCDF) where he arrived at 5:00 p.m. (*Id.*) Upon his arrival at DCDF, Darrah was again strip searched and scanned for contraband using a low-dose x-ray scanner. (*Id.*) Under DCSO policy, searches are conducted to restrict the flow of contraband into the facility. (ECF No. 29-1 at 2.) Policy 513 entitled "Searches" at 513.4.2 "STRIP SEARCHES UPON ENTRY INTO A HOUSING UNIT" states that "Strip searches will be conducted on all sentenced inmates upon admission into a housing unit. Written authorization from the Shift Commander is required for

inmates other than sentenced inmates." (ECF No. 29-1 at 5.) A sentenced inmate is defined as "[a]n inmate who is in custody for the purpose of serving a sentence after a conviction." (*Id.* at 1.) The policy further states that a strip search of a sentenced inmate "should be conducted when the inmate has entered an environment outside the secure perimeter of the jail where contraband or weapons may be accessed." (*Id.* at 5.) A strip search is defined as a "search that requires a person to remove or rearrange some or all of his/her clothing to permit a **visual inspection** of the underclothing, breasts, buttocks, anus or outer genitalia of the person. This includes monitoring of a person showering or changing clothes where the person's underclothing, buttocks, genitalia or female breasts are visible to the monitoring employee." (*Id.* at 1–2.) (emphasis added.) The policy also defines "physical body cavity search" as a "search that includes a visual inspection and may include a physical intrusion into a body cavity. Body cavity means the stomach or rectal cavity of a person, and the vagina of a female person." (*Id.* at 1.) As for a physical body cavity search pursuant to 513.4.5 "No person shall be subjected to a physical body cavity search without written approval of the Captain of Jail Operations or the authorized designee and only with the issuance of a search warrant." (*Id.* at 7.)

Dodge County Sheriff's Office Policy 521 entitled "Body Scanner" states Tek84 Intercept full body scanner is a "[l]ow dose X-ray scanning system that detects various types of dangerous or illegal substances such as liquid explosives, drugs, copper wires, plastics, etc." (ECF No. 29-2 at 2.) The policy further states, "[t]he body scanner will be utilized prior to booking for all inmates . . that enter the Dodge County Detention Facility and for inmates who return when they have ben out of the facility unsupervised." (*Id.* at 1.)

## PROCEDURAL HISTORY

On December 19, 2023, Darrah filed a motion to suppress the evidence recovered during the search, arguing that the search violated the Fourth Amendment's reasonable suspicion requirement. (ECF No. 24.) On February 1, 2024, Magistrate Judge Stephen C. Dries issued a report recommending that Darrah's motion be denied. (ECF No. 39.) In denying Darrah's motion to suppress, Judge Dries made no finding regarding the reasonableness of the USMS search but found that the government established by a preponderance of the evidence that Dodge County correctional staff would have inevitably discovered Darrah's contraband upon his arrival at DCDF. (ECF No. 39 at 13.) Therefore, any disputed facts concerning the Marshals justification for their search are immaterial because the inevitable discovery exception to the exclusionary rule is

applicable.  (*Id.*)  Darrah objects to Judge Dries's finding, arguing that although the government established that Darrah was actually searched and scanned when he arrived at DCDF, the government failed to establish that DCDF correctional officers conducting the search and scan would have detected and discovered the drugs secreted in his buttocks area.  (ECF No. 44 at 5.)  Darrah further argues that Judge Dries failed to properly consider Darrah's contention that he would have flushed the drugs prior to his arrival at DCDF.  (*Id.* at 12.)

## STANDARD OF REVIEW

A district court reviews *de novo* "those portions of [a magistrate judge's] report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Crim. P. 59(b)(3).  This "review requires the district [court] judge to decide the case based on an independent review of the evidence and arguments without giving any presumptive weight to the magistrate judge's conclusion."  *Mendez v. Republic Bank*, 725 F.3d 651, 661 (7th Cir. 2013).  The district court "makes the ultimate decision to adopt, reject, or modify" the magistrate judge's recommendation.  *Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 760 (7th Cir. 2009).  Unchallenged portions of the report are reviewed only for clear error. *See Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999) (citing *Goffman v. Gross,* 59 F.3d 668, 671 (7th Cir. 1995)).

## ANALYSIS

### I.    The Discovery of Defendant's Concealed Narcotics Was Inevitable.

Judge Dries rejected Darrah's motion to suppress, concluding that evidence of the narcotics parcel was admissible under the inevitable discovery doctrine, because, even if the search was unlawful, authorities would have inevitably discovered the drugs upon Darrah's arrival at DCDF. (ECF No. 39 at 13.)  The Court agrees.[1]

The Supreme Court first adopted the inevitable discovery doctrine in *Nix v. Williams*, 467 U.S. 431, 444 (1984), establishing an exception to the exclusionary rule.  The Supreme Court held that when the government obtains evidence through a constitutional violation, the evidence need not be suppressed "if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . ."  *Id.*  The

---

[1] The Court notes that the search was likely also appropriate because the record suggests the Marshals had reasonable suspicion for the search.  (ECF No. 24-2.)  For the reasons explained in this Order, the Court agrees with Magistrate Judge Dries that the search results are in any event protected by the inevitable discovery doctrine and will adopt his report and conclusions on that basis.

inevitable discovery analysis is a counterfactual one. *See id.* As noted by Judge Dries, it requires the Court to consider "what might have happened (but didn't)." (ECF No. 39 at 10.) The government therefore bears the burden of providing facts that show that the contraband in question "ultimately or inevitably" would have been found under lawful circumstances. *Nix*, 467 U.S. at 444.

In *Nix*, the defendant, who had invoked his right to counsel, provided a statement to the police outside the presence of counsel which revealed the location of a 10-year-old homicide victim's body. *Id.* at 435–36. The police proceeded to the place described by the defendant and found the child's body. *Id.* at 346. The Supreme Court concluded that if the government could prove that the evidence inevitably would have been discovered by legal means then "the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." *Id.* at 444. The police in *Nix* had established a 200-person volunteer search group that was two and one-half miles away from the location of the victim's body when the search was called off due to the defendant's statement. *Id.* at 435–37. The government introduced evidence that the search team would have found the body "within a short time" had the search continued. *Id.* at 437–8. After explaining that "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment," *id.* at 444 n.5, the Supreme Court concluded that the evidence demonstrated that the body inevitably would have been found even if the defendant had not been unlawfully questioned by law enforcement outside the presence of counsel, *id.* at 448-450. The body was found in the geographical search area and "near a culvert, one of the kinds of places the teams had been specifically directed to search." *Id.* at 449.

As applied to Darrah, the government must demonstrate both that "it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence;" and "it would have conducted a lawful search absence the challenged conduct." *United States v. Marrocco*, 578 F.3d 627, 637–38 (7th Cir. 2009) (finding the suppression of evidence inappropriate based on the inevitable discovery doctrine). The government has provided both requirements here.

There is no dispute as to the first element. The record confirms that when Darrah arrived at DCDF, he was subjected to a strip search and full body scan pursuant to Dodge County policies. (ECF No. 39 at 9 (citing ECF No. 29-2 at 3).) Darrah does not contest that DCDF had the lawful

and constitutional authority to search him upon his arrival and concedes that the "government established that he was actually searched and scanned when he got to the DCDF." (ECF No. 44 at 5.)

Darrah instead challenges the second prong of the inevitable discovery analysis. (*Id.*) He argues that the government did not establish that the DCDF correctional officers conducting the search and that the scan would have detected and discovered the brown oval object that Darrah had secreted in his buttocks area. (*Id.* at 7.) Further, Darrah argues that the government did not prove by a preponderance of the evidence that the drugs found by the Marshals would still be hidden in Darrah's buttocks by the time Darrah arrived at DCDF. (*Id*. at 14.) Darrah's objections are unavailing.

Darrah was subjected to two distinct lawful searches intended to discover the type of contraband he had possessed while in the Marshal's lockup. The DCDF policy language instructs the DCDF staff to conduct a "strip search" of an inmate, such as Darrah, upon admission into a housing unit, and that strip search includes a visual inspection of the buttocks and anus. The applicable DCSO policy requires a "visual inspection of the underclothing, breasts, buttocks, anus, or outer genitalia of the person." (ECF No. 29-1 at 1–2.) Darrah argues that the DCSO policy does not direct the type of visually intrusive search as described in USMS Policy Directive and as conducted by Hitchler and attempts to create a distinction between USMS's "visual body cavity search" and DCSO's "strip search." (ECF No. 44 at 6–7.) A straightforward reading of both policies requires the corrections officer to visually inspect the inmate's anus. As Darrah acknowledges, the drugs were discovered during USMS "visual body cavity" search when Darrah "squatted down and spread his cheeks" resulting in the discovery of a "large brown oval shaped object between Darrah's buttocks in his anus area." (ECF No. 44 at 7 n.4.) At DCDF, the DCSO policy regarding strip searching a sentenced prisoner would have permitted a visual inspection of the prisoner's anus. (*See* ECF No. 29-1 at 1–2.) Although the policies are not identical, there is no material distinction between the USMS and DCSO strip search as both require a visual inspection of an inmate's anus. (*Compare id. with* ECF No. 24-3 at 2–3.) There is no doubt that both searches would have revealed the contraband drug package.

Darrah notes that DCSO's search policy at 5131.1 also describes a "physical body cavity search" as a "search that includes a visual inspection and may include a physical intrusion into a body cavity. Body cavity means the stomach or rectal cavity of a person . . . ." (ECF No. 52 at 3

(quoting ECF No. 29-1 at 1).) The policy further requires that "[n]o person shall be subjected to a physical body cavity search without written approval of the Captain of Jail Operations or the authorized designee and only with the issuance of a search warrant." (ECF No. 29-1 at 7.) Similar to DCSO's policies, USMS distinguishes between a strip search and physical body cavity search. There is no dispute, however, that Darrah was subjected to a strip search and not a physical body cavity search at both locations. In fact, when Hitchler visually noticed the large brown oval shaped object in Darrah's anus, Hitchler asked Darrah what he had between his buttocks. (ECF No. 24-1 at 2.) Darrah repeatedly denied that he had anything secreted in his anus but later removed the item himself when confronted with the fact that if he did not remove the item, the Marshals would transport him to the hospital for its removal. (*Id.*) USMS did not have to resort to a physical body cavity search. (*See id.*)

DCDF's intake procedures provided the government "an independent, legal justification for conducting a search that would have led to the discovery" of the drugs hidden in Darrah's anus. *See Marrocco*, 578 F.3d at 637–38. The government has also demonstrated that absent the Marshals' challenged conduct, Darrah would have been searched at DCDF and in fact, was searched. *See id.* at 638. The discovery of a parcel of narcotics the size of a fist was indeed inevitable under the DCSO strip search policy. Because the Court finds that the government has demonstrated the inevitable discovery of the drugs from a DCSO strip search, the exclusionary rule does not apply to preclude admission of the discovered evidence.

Darah also concedes that he was scanned upon his arrival at DCDF but argues that he is entitled to an evidentiary hearing to determine if the machine used would have actually discovered the drugs. (ECF No. 44 at 7, 16.) Darrah contends that Judge Dries lacked objective information to find that the DCDF scanner would inevitably have detected the drugs that had been discovered during the USMS search. (*Id.* at 10.) Judge Dries rejected Darrah's request for an evidentiary hearing finding that "[r]equiring the government to demonstrate the effectiveness of a device specifically designed to identify hidden contraband would hold the government to a much higher standard than is mandated." (ECF No 39 at 10.) The Court agrees with the Judge Dries that the relevant issue is whether a subsequent lawful search would have occurred. It is not the Court's place "to conduct a qualitative assessment of the efficacy of an entirely theoretical search." (ECF No. 48 at 9); *see Nix,* 467 U.S. at 449–50 (applying inevitable discovery doctrine on a showing that the search group was tasked with searching the specific geographic area, including culverts,

and concluding this would have ultimately resulted in location of challenged evidence). The government has satisfied the requirements of the inevitable discovery doctrine by a preponderance of the evidence and an evidentiary hearing is not necessary.

As noted by the government, courts generally have applied the inevitable discovery doctrine to scenarios where a warrant was not obtained by law enforcement but would have been obtained absent the contested search. (ECF No. 48 at 11 (citing *United States v. Tejada*, 524 F.3d 809, 813 (7th Cir. 2008); *United States v. Pelletier*, 700 F.3d 1109, 1117 (7th Cir. 2012)).) In the cited cases, it was sufficient for the government to demonstrate that the area where the contraband was located would inevitably have been lawfully searched. *Tejada*, 524 F.3d at 813 ("to use the doctrine of inevitable discovery to excuse its failure to have obtained a search warrant" the government must "prove that a warrant would certainly, and not merely probably, have been issued had it been applied for); *Pelletier*, 700 F.3d at 1116 ("[T]he government must show not only that it *could* have obtained a warrant, but also that it *would* have obtained a warrant."). In this case, the government has shown by a preponderance of the evidence that Darrah would have been subjected to a lawful search upon his entrance to DCDF and those searches, designed to discover contraband, would have discovered the drugs secreted in Darrah's anus.

## II. Whether Darrah would have destroyed the drugs is immaterial.

Darrah next contends that discovery was not inevitable because he could have plausibly destroyed the evidence by flushing the drugs down the toilet in his cell at the USMS facility. (ECF No. 44 at 12.) The government contends what Darrah might have done with the evidence is irrelevant as to whether such evidence should be suppressed. (ECF No. 48 at 12.) The Supreme Court has rejected the contention that a defendant's opportunity to destroy evidence can support exclusion or suppression of evidence. *Segura v. United States*, 468 U.S. 796, 813–6 (1984). In *Segura*, the Supreme Court considered this idea in the context of a case where residents of a home could have had an opportunity to destroy evidence, but for the warrantless entry of police officers. *Id.* The Supreme Court noted that the "suggestion that [the defendant] and her cohorts would have removed or destroyed the evidence was pure speculation." *Id.* at 816. The Court went on, ruling that it "decline[d] to extend the exclusionary rule, which already exacts an enormous price from society and our system of justice, to further 'protect' criminal activity . . . ." *Id.* In closing, the Court rejected the concept of "some 'constitutional right' to destroy evidence," saying "[t]his concept defies both logic and common sense." *Id.* The Seventh Circuit has fully adopted this

reasoning.  *See United States v. Jones*, 214 F.3d 836, 838 (7th Cir. 2000) ("An argument that the suspects would have destroyed the drugs, if only they had more time and full possession of their faculties, is not a good reason to suppress probative evidence of crime.") (citing *Segura*, 468 U.S. at 813–16); *United States v. Blackwell*, 416 F.3d 631, 633 (7th Cir. 2005) ("The exclusionary rule does not apply to evidence that is sure to be located through lawful procedures. . . . Suppression of such evidence would be a windfall for the accused.").  Accordingly, Darrah is not entitled to relief under the exclusionary rule.

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the Court **OVERRULES** Defendant's objections to Judge Dries's Report and Recommendation, ECF No. 44, and **ADOPTS** the Recommendation of Judge Dries, ECF No. 39.

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress, ECF No. 24, is **DENIED**.

Dated at Milwaukee, Wisconsin on September 23, 2024.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge